**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| JANE DOE (S.A.J.) an individual, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. 1:25-cv-601 |
| FORESIGHT INVESTMENTS INCORPORATED d/b/a MOTEL 6 | |
| *Defendant.* | JURY TRIAL DEMANDED |

## PLAINITFF'S ORIGINAL COMPLAINT

Jane Doe (S.A.J.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against FORESIGHT INVESTMENTS INCORPORATED d/b/a MOTEL 6, as Defendant, and would respectfully show the Court and jury as follows:

## SUMMARY

1. Jane Doe (S.A.J.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendant and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion.[1] Traffickers use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

4. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. Jane Doe (S.A.J.) alleges that Defendant derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (S.A.J.), with minimal risk of detection or interruption. Jane Doe (S.A.J.) further alleges that Defendant continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendant was, therefore, knowingly receiving a benefit from participation in a venture that Defendant knew or should have known was engaged in sex trafficking.

---

[2] 18 U.S.C. §1591(e)(3).

8. Defendant continued supporting traffickers, including Jane Doe (S.A.J.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at their hotels and specifically at the Motel 6 property located at 22105 Katy Freeway, Houston, TX 77450. Defendant was, therefore, knowingly receiving a benefit from participation in a venture that Defendant knew or should have known was engaged in sex trafficking.

## PARTIES

9. Plaintiff, Jane Doe (S.A.J.) is a resident of Washington. She may be contacted through her lead counsel, whose information is contained below.

10. Jane Doe (S.A.J.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

11. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (S.A.J.)

12. Defendant Foresight Investments Incorporated ("Foresight") is a for-profit Texas company with its principal place of business in Dallas, Texas. It may be served through its registered agent: Lloyd Ward, 1401 Elm St., Suite 3459, Dallas, Texas 75202 or wherever he may be found. At all relevant times, Defendant Foresight owned, operated, controlled, and/or managed the Motel 6 located at 22105 Katy Freeway, Houston, TX 77450.

13. Defendant Foresight will be referred to as "Franchisee" or "Defendant."

14. Upon information and belief, Franchisee operated their respective motel property pursuant to franchise agreements with G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality

Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP (collectively, "G6" or "Franchisors").[3]

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred.

17. Under 28 U.S.C. § 1391(c)(2), Franchisee is a resident of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over Franchisee.

18. Under § 1391(d), Franchisee is residents of Texas for the purpose of § 1391(b)(1) because, if the Eastern District of Texas was a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

19. Plaintiff's claims against Franchisee arise out of Franchisee's contacts with Texas through Franchisee's relationship with G6, which have their principal place of business in the Eastern District of Texas. Franchisee's participation in a venture with G6 operating the Subject Motel 6 occurred, in substantial part, in Texas because:

a. Upon information and belief, Franchisee actively sought out a franchising relationship by contacting G6 in Texas;

b. Franchisee acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Eastern District of Texas;

c. Franchisee agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

d. The franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

[3] G6 is referenced herein for factual and background purposes only. G6 is not named as a defendant in this action.

e. The franchising agreements required Franchisee to report information to G6 in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like Jane Doe (S.A.J.);

f. Franchisee agreed to submit all notices required under the franchising agreement to G6 in the Eastern District of Texas;

g. Franchisee was required to attend training and meetings in Texas;

h. G6 dictated policies related to safety, security, human trafficking, employee training and Franchisee' response, as well as other subjects from their principal place of business in the Eastern District of Texas;

i. Franchisee had an ongoing obligation to participate in centralized programs operated by G6 from their principal place of business in the Eastern District of Texas;

j. Franchisee was required to purchase insurance on behalf of one or more Texas entities (G6);

k. Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

l. Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisors in Texas;

m. The benefit that Franchisee received from room rentals was governed by the Texas franchising agreement;

n. Franchisee agreed to make all payments due under the franchising agreement at G6 principal place of business in the Eastern District of Texas;

o. Franchisee's operation of the subject motels were controlled and/or influenced by many policies set and enforced by G6 from their principal place of business in Carrollton, Texas; and

p. Franchisee signed a software licensing agreement with G6 for the property management software G6 required Franchisee to use when operating the motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Franchisee agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## STATEMENT OF FACTS

### I. Jane Doe (S.A.J.) is a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendant.

20. Jane Doe (S.A.J.) is a survivor of sex trafficking. Her trafficking began in or about 2005 and lasted through December of 2015.

21. Jane Doe (S.A.J.) first came into contact with her trafficker at a gas station in Minnesota. While in Minnesota, Jane Doe (S.A.J.)'s trafficker gained her trust and eventually convinced Jane Doe (S.A.J.) to enter a relationship with him. This relationship was built on false representations and cause Jane Doe (S.A.J.) to believe that her trafficker actually cared for her and wanted a genuine relationship. This was not the case at all, Jane Doe (S.A.J.) had no reason to suspect or believe that she would be forced into being sex trafficked for her trafficker's financial benefit.

22. From 2005 through December 2015, Jane Doe (S.A.J.)'s trafficker forced her to engage in commercial sex acts and required her to arrange meetings with multiple sex buyers each day for his financial benefit. These sex buyers would respond to online ads Jane Doe (S.A.J.)'s trafficker would post. Jane Doe (S.A.J.)'s trafficker would physically and mentally abuse her. Jane Doe (S.A.J.) was in constant fear for her life.

23. Jane Doe (S.A.J.) did not want to engage in commercial sex. When she refused or attempted to resist, her trafficker made clear that she had no choice. He used physical violence, threats, and intimidation to maintain control over her, subjecting Jane Doe (S.A.J.) to constant abuse and creating a climate of fear that prevented her from leaving. Jane Doe (S.A.J.)'s trafficker even broke one of her eye sockets. This abuse continued for over a decade.

24. Jane Doe (S.A.J.) was not allowed to keep any of the money she made.

25. At various times in 2005 through December 2015, Jane Doe (S.A.J.) was trafficked at the Motel 6 property located at 22105 Katy Freeway, Houston, TX 77450 ("Subject Motel 6").

26. Jane Doe (S.A.J.)'s sexual exploitation repeatedly occurred in rooms of the Subject Motel 6 and was facilitated by Franchisee.

27. During the period in which Jane Doe (S.A.J.) was trafficked at the Subject Motel 6, the rooms in which she was exploited were frequently paid for with cash or prepaid cards, and other victims of sex trafficking were exploited at the same hotel at the same time. Housekeeping staff was regularly prevented from entering the rooms for routine cleaning, towel exchange, or other standard services. Jane Doe (S.A.J.)'s trafficker was often present with her at check-in and would linger on the property, including in the parking lot, while she was forced to meet with sex buyers. There was a constant and heavy flow of adult males entering and exiting her room, many of whom were not registered hotel guests, remained on the premises only briefly, and arrived at unusual hours. Jane Doe (S.A.J.) was compelled to meet as many sex buyers as possible each day, resulting in patterns of activity that were inconsistent with legitimate hotel use and consistent with well-known indicators of sex trafficking in the hospitality industry.

## II. The Hotel Industry's Role in Sex Trafficking and Defendant's Knowledge of the Problem.

28. While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Franchisee knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including the trafficking of Jane Doe (S.A.J.), was pervasive and apparent at the Subject Motel 6.

29. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[5] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90 percent of commercial exploitation of children.[7]

30. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendant, on best practices for identifying and responding to sex trafficking.[8]

31. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[9]

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[7] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[8] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[9] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children,

32. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendant was aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appears to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

---

https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[10]

33. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[11] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

34. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[12] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

35. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendant understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendant knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[13]

36. Defendant was aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing

---

[10] *Id.*

[11] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[12] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[13] *Id.*

policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

37. Defendant was specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendant received training and guidance on this. Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendant to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendant was thereby benefiting from the harboring of sex trafficking victims

38. The most effective weapon against sexual exploitation and human trafficking is education and training.[14] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[15]

39. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[16] In reference to companies like the Defendant,

---

[14] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[15] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[16] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

40. There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

41. Franchisors' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, Franchisee, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

42. Franchisee had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

43. Unfortunately for Jane Doe (S.A.J.), the promises made by Franchisee have proven empty. Defendant has failed, at all levels, to take appropriate action in response to their knowledge

of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (S.A.J.).

### III. Sex Trafficking Has Long Been Prevalent at Motel 6 Branded Properties, and Defendant Has Known About It.

44. Defendant's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendant has known, since well before Jane Doe (S.A.J.)'s trafficking, that sex trafficking was ongoing and widespread at G6 branded properties including the Subject Motel 6 named herein.

45. Use of G6 branded properties for sex trafficking is well known to G6 and Franchisee. G6 branded hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[17]

46. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that G6 paid to settle a public nuisance lawsuit filed by the City of Los Angeles.[18] G6 knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

47. The settlement required G6 to change policies that were facilitating sex trafficking.[19] Based on information and belief, G6 has failed to adequately implement and enforce such changes.

[17] https://traffickinginstitute.org/wp-content/uploads/2022/01/2018-Federal-Human-Trafficking-Report-Low-Res.pdf; https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf

[18] *Motel 6 pays $250,000 to settle human trafficking suit* (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

[19] *Id.*

48. G6 intentionally ensures its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[20]

49. Public statements of G6 confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their branded hotels to this problem. G6 recognize that ""[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[21] They also acknowledged the significant role G6 has in the three D's: **deterring, detecting,** and **disrupting sex trafficking** in their branded hotels.[22]

**a. Sex Trafficking at G6 Branded Hotels was well Known by Defendant**

50. Upon information and belief, each of the Defendant monitored criminal activity occurring at G6 branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the Subject Motel 6 where Jane Doe (S.A.J.) was trafficked.

51. Scores of news stories from across the US highlight G6's facilitation of sex trafficking and certainly establish that Defendant knew, or should have known, of the use of G6 branded hotels for sex trafficking.

52. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of G6 branded hotels for illegal activity, the following was noted:

---

[20] *Motel 6 – An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six (last visited Aug. 10, 2023).
[21] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[22] *Id.*

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[23]

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[24]

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[25]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[26]

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[27]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[28]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[29]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[30]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[31]

---

[23] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.
[24] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.
[25] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html.
[26] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.
[27] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.
[28] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.
[29] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[30] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.
[31] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[32]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[33]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[34]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[35]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[36]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[37]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[38]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department

---

[32] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.
[33] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/.
[34] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.
[35] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.
[36] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.
[37] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.
[38] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[39]

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[40]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[41]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[42]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[43]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[44]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[45]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[46]

---

[39] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.poastandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.

[40] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[41] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[42] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015),https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[43] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

[44] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[45] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[46] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[47]

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[48]

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[49]

53. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at G6 branded hotels. Moreover, on information and belief, G6 and Franchisee was aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

54. Upon information and belief, G6 and Franchisee monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Subject Motel 6 named herein where Jane Doe (S.A.J.) was trafficked.

55. Reviews of G6 Branded properties, which upon information and belief G6 and Franchisee, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and G6's knowledge of the same, including Franchisee. For example:

- 2010 TripAdvisor review from Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the

---

[47] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[48] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

[49] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[50]

- 2011 Yelp review from California states "…We paid to spend two nights, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[51]

- 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[52]

- 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[53]

- 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[54]

- 2012 Yelp review from Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[55]

---

[50] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html.
[51] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa.
[52] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_Airport-Oakland_California.html.
[53] https://www.yelp.com/biz/motel-6-salinas.
[54] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html.
[55] https://www.yelp.com/biz/motel-6-dallas-4.

- 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you get my drift, and when i called the front desk they said they would check it out and never did…"[56]

- 2012 TripAdvisor review from Illinois states "……They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few underage girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..."[57]

- 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[58]

- 2013 Yelp Review from Seatac, WA states "Had business in Seattle so I was only staying one night. I'm not from the area, so I didn't realize the location is within a virtual "red light district". After checking in, I pulled up to a parking spot near my room and was immediately stared down by a charming African-American gentleman who approached my car with the intention of probably other than asking for directions. Once he saw how big I was, he backed off and started walking the other way. I walked up to the non-operating keycard security door (complete with cracked glass and "caution" tape across it), and in the hallway was passed by a couple of, you guessed it, more charming individuals! (ladies, this time..the kind who appeared to be "on the clock") They, too, stared me down, and I continued to my room. The room appeared to be updated --- the only part of this stay that went right. AVOID THIS PLACE unless you are a crackhead, meth freak, prostitute or are looking to be violated in some way. I honestly can't believe this passes for a motel, as the majority of the people wandering the halls during my stay were DEFINITELY there for reasons other than just needing a place to stay." [59]

---

[56] https://www.yelp.com/biz/motel-6-escondido?start=60.
[57] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html.
[58] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_Buffalo-Amherst_New_York.html.
https://www.yelp.com/biz/motel-6-seattle-seattle.
[59] https://www.yelp.com/biz/motel-6-seattle-seattle.

- 2014 Trip Advisor Hotel Review from Bend, OR states "….. Busted a male smoking pot, in front of my window when I have my 2 smallkids in room sleeeping. Not to mention prostitutes all around. Never will I stay again"[60]

- 2014 Yelp Review from Pheonix, AZ states "I am unfortunately living near to this hotel from hell, so everything I am about to write comes from being around this festering house of prostitution and meth 24/7.If there was ever a place you don't want to be around, it is this place, a towering achievement to the owners looking the other way, or taking money under the table from the drug dealers and pimps that crawl on this place from tile to water marked ceiling. From the swat teams busting down doors, to the loud fist fights in broken English nightly this place deserves to be torn down and a marker for each life lost in the parking lot or room placed as reminder of what went on there. It is a blight on the world. Do not under any circumstances stay there, not even in the parking lot. There has been multiple people shot in the parking lot from competitors and police alike. There are almost monthly raids that seem to do nothing to deter the crime that goes on at all times of the night and day. It spills into the surrounding houses and businesses that surround this motel from hell. If you doubt me in any way a quick look on the net for this address will lead you to news tidbits about the theft rings based out of the rooms, the human traffic, the prostitution and gruesome murders, the severed body parts of people lured into the motel for some hanky panky via craigslist. It is legend in this neighborhood and it has lost it's shock value after 10 years of living around it. Nothing good can come of this place, not even a good nights sleep. That is a guarantee. If you are reading this in the parking lot before entering, you have been warned my poor hapless traveler. This place is death. Ever wanted to see a hooker walk around in hot pants and a feather boa just like on TV? Ever wanted to see someone get killed in broad daylight and scream out their last breath to a fleeing crowd of onlookers intent on keeping their drugs safe and sound? Well just come on over and rent a room. This place is a curiosity for thrill seekers and the foolish looking for blood or prison. Avoid this place like the plague!!There are no less than two "work today get paid today" agencies based out of this hotel, it attracts all of the drug addicts and sex offenders in the area. I receive about 2-3 sex offender fliers in my mail each month and it is always listing this motel as where they are staying."[61]

- 2014 Trip Advisor Review from Charleston, SC states "My 2 Friends and I can down for a girls vacation. We found this hotel on a app and being 3 college kids, saving money is a must! Who could turn down a $54 room? Right, well when we got there first they sent us to a room that wasn't even clean. A hotel staff was up on the floor walking around talking to the gang of men on the walkway, she then took is to another room. As we was walking away………… men made very inappropriate comments about us, about what they would like to do to us! And the staff just laughed about it like it wasn't a big deal. We was terrified by the time we

[60] https://www.tripadvisor.com/Hotel_Review-g51766-d244139-Reviews-Motel_6_Bend-Bend_Central_Oregon_Oregon.html.
[61] https://www.yelp.com/biz/motel-6-phoenix-8.

returned to my car I was in a full blown panic attack! ………. the guys and the rude sexual comments, the men drinking 40's (beer) in the parking lot blaring hip-hop music from their cars, grills in the parking lot like people lived their, possible prostitution and a drug dealing we actually witnessed…… We refused to stay in such conditions especially when we feared the walk from our car to our room! Stay away from this place, it may have a good low price but it's so not worth it!"[62]

- June 2018 Trip Advisor Review states "…………………. Very sketchy people everywhere, pretty sure I saw a escort lady walking around the parking lot and lot of people who like meth."[63]
- August 2020 Expedia Review from Omaha, NE states "Guys, it's just in a bad area. A really bad area. There was blatant drug activity and prostitution going on…….They weren't the problem, the clientele was the problem."[64]
- June 2021 Expedia Review from Omaha, NE states ……….. We paid 110 dollars a night to be afraid of going out after dark because there were transients,hookers,and drug addicts both wandering the property and renting the rooms.[65]

56. These and other news stories, guest surveys, and online reviews show that the use of G6 branded hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of G6 branded hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

57. Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at G6 branded hotels, including the Subject Motel 6 named herein, and while Defendant claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Motel 6 named herein frequently and long after the trafficking of Jane Doe (S.A.J.).

---

[62] https://www.tripadvisor.com/Hotel_Review-g54370-d97550-Reviews-Motel_6_Charleston_North-North_Charleston_South_Carolina.html
[63] https://www.tripadvisor.com/Hotel_Review-g60885-d91492-Reviews-Motel_6_Omaha-Omaha_Nebraska.html
[64] https://www.expedia.com/Omaha-Hotels-Motel-6-Omaha.h1184821.Hotel-Reviews
[65] https://www.expedia.com/Omaha-Hotels-Motel-6-Omaha.h1184821.Hotel-Reviews

58. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (S.A.J.) was trafficked at the Subject Motel 6 named herein, G6 and Franchisee knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at G6 branded properties;

b. Sex trafficking was a brand-wide problem for G6 originating from management level decisions at their corporate offices in Carrollton, Texas;

c. G6 Franchisee and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d. G6 and Franchisee's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e. G6 and its Franchisee was earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

59. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, G6 and Franchisee chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendant had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Motel 6 named herein.**

60. G6 and Franchisee were specifically aware that sex trafficking was widespread and ongoing at the Subject Motel 6 named herein.

61. Traffickers, including Jane Doe (S.A.J.)'s trafficker, repeatedly chose to use the Subject Motel 6 for their sex trafficking activity. As such, G6 and Franchisee also knew or should have known about the pervasive sex trafficking at the Subject Motel 6 based on obvious indicators of this activity.

62. Traffickers, including Jane Doe (S.A.J.)'s trafficker, repeatedly selected and used the Subject Properties to carry out sex trafficking activity. This repeated and patterned use was

reflected in Defendants' own reservation, payment, occupancy, guest traffic, and incident-reporting data generated in the ordinary course of hotel operations. As a result, Defendants knew or should have known that their properties were being used to facilitate commercial sex and human trafficking

63. Defendant knew that a population of traffickers, including Jane Doe (S.A.J.)'s trafficker, repeatedly chose to use the Subject Motel 6 for their sex trafficking activity. They selected G6 branded properties, including the Subject Motel 6, because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Motel 6. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendant also knew or should have known about the pervasive sex trafficking at the Subject Motel 6 based on obvious indicators of this activity.

64. This population of traffickers, including Jane Doe (S.A.J.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendant and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendant.

65. Upon information and belief, there were other victims being trafficked at the Subject Motel 6 at the same time as Jane Doe (S.A.J.) and there were obvious signs these victims were being trafficked.

66. Based upon information and belief, the conduct of Defendant facilitated the trafficking of a number of victims by a population of multiple traffickers at the Subject Motel 6.

Defendant developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

67. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Motel 6 prior to Jane Doe (S.A.J.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

68. All knowledge from the staff at the Subject Motel 6 is imputed to Franchisee respectively. Franchisee knew about this widespread and ongoing trafficking at the Subject Motel 6, including the trafficking of Jane Doe (S.A.J.), through the direct observations of hotel staff, including management-level staff. Franchisee provided boots on the ground.

69. Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from hotel staff and management, Franchisee learned or should have learned about the obvious signs of widespread trafficking at the Subject Motel 6 based on non-public sources of information including but not limited to:

a. Surveillance of property;

b. Internal investigations;

c. Customers complaints;

d. Monitoring of customer feedback;

e. Information received from law enforcement.

70. Upon information and belief, both Franchisee knew or should have known about the widespread trafficking at the Subject Motel 6 based on:

a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to G6;

b. The Defendant's regular monitoring of online reviews;

c. The Defendant's collection and monitoring of customer surveys and complaints;

d. The Defendant's regular inspections of their hotel property;

e. Information provided to Defendant by law enforcement; and

f. Other sources of information available to Defendant.

71. Upon information and belief, under G6's protocols, which on their face required hotel staff and management to report suspected criminal activity to G6, hotel staff and management were required to report numerous instances of suspected sex trafficking to G6 prior to Jane Doe (S.A.J.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Motel 6.

72. Upon information and belief, Franchisee observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Motel 6 based on their supervision and monitoring of the property.

**a. Defendant knew the venture that resulted in Jane Doe (S.A.J.)'s trafficking was operating at the Subject Motel 6 because of the apparent and obvious "red flags" of sex trafficking.**

73. During the period that Jane Doe (S.A.J.) was trafficked at the Subject Motel 6 named herein, there were obvious signs that her traffickers were engaged in sex trafficking:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (S.A.J.);

c. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

d. The traffickers were often present with Jane Doe (S.A.J.) at check in and would linger around the hotel or in the parking lot while she was with a john;

e. There was heavy foot traffic in and out of Jane Doe (S.A.J.)'s room involving men who were not hotel guests;

f. Jane Doe (S.A.J.) was forced to see as many johns possible every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

g. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

74. Based upon information and belief, multiple employees at the Subject Motel 6 named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

75. As such, Defendant knew or was willfully blind to the fact that Jane Doe (S.A.J.) was being trafficked at the Subject Motel 6.

76. Given these obvious signs, Franchisee knew or should have known about the trafficking of Jane Doe (S.A.J.) based on the G6 policy or protocol that they were required to follow, to have hotel staff report suspected criminal activity including sex trafficking.

**IV. Defendant actively facilitated sex trafficking at the Subject Motel 6, resulting in the trafficking of Jane Doe (S.A.J.).**

77. Franchisee had both actual and constructive knowledge of the trafficking of Jane Doe (S.A.J.) at the Subject Motel 6 because the trafficking was the direct result of Franchisee facilitating her trafficking at the Subject Motel 6.

78. Despite mining and monetizing customer data for marketing and other purposes, Defendant further refuse to expend the necessary resources to educate their staff or implement and enforce anti-trafficking measures and reporting.

79. Intent on benefitting from the profit created by rooms rented for this explicit and apparent purpose and acquiring valuable customer data by providing free internet, services which attracts traffickers, Defendant repeatedly ignore the open and obvious presence of commercial sex on their properties

**a. Franchisee facilitated the trafficking of Jane Doe (S.A.J.).**

80. Franchisee is responsible for the acts, omissions, and knowledge of all employees of the Subject Motel 6 when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee ratified these acts and omissions, and because Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of sex trafficking occurring at G6 branded locations including the Subject Motel 6.

81. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Motel 6, Franchisee continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

82. Franchisee knew or was willfully blind to the fact that Jane Doe (S.A.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.A.J.)'s sexual exploitation.

83. Franchisee also knowingly benefited from acquiring valuable customer data when they provided free Wi-Fi to patrons at the Subject Motel 6, including Jane Doe (S.A.J.)'s trafficker

and buyers. Franchisee profited from data collected each and every time Jane Doe (S.A.J.)'s trafficker and buyers used the Subject Motel 6 Wi-Fi to advertise and solicit Jane Doe (S.A.J.) for commercial sex at the Subject Motel 6.

84. Franchisee knowingly benefited from allowing the ongoing use of its Wi-Fi to access websites like Backpage, and other notorious pages used for the advertisement of commercial sex, knowing that if they cut-off access to such pages, they would lose traffickers' and buyers' regular and profitable patronage.

85. Franchisee also facilitated widespread trafficking at the Subject Motel 6, including the trafficking of Jane Doe (S.A.J.), in ways including:

a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b. The Role of the G6 Franchisor–Franchisee Relationship in Facilitating Trafficking at the Subject Motel 6.**

86. Upon information and belief, the Subject Motel 6 was operated pursuant to Franchisor policies, systems, and controls established by G6 and adopted, implemented, and relied upon by Defendant in their day-to-day hotel operations, including in ways that influenced whether and to what extent sex trafficking occurred at the hotels, including the trafficking of Jane Doe (S.A.J.):

a. G6 has publicly assumed responsibility and control over the human trafficking response of all G6 branded properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels;

c. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control of the response to trafficking by creating a reporting hotline for hotel staff and Franchisee to report suspected human trafficking to G6. G6 determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. G6 determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, G6 acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. G6 maintained a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all G6 branded properties, including suspected trafficking incidents;

i. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Motel 6;

j. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control over all details of the terms under which franchised hotels, including the Subject Motel 6, offered internet services to customers,

including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. G6 dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Motel 6;

k. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 retained control over collecting, maintaining, and analyzing detailed data regarding housekeeping services at the Subject Motel 6, including trends that would reveal patterns consistent with human trafficking.

87. Defendant rented rooms at the Subject Motel 6 using franchisor-mandated reservation, payment, and data systems that were owned, controlled, and operated by G6 (day-to-day control), including the following:

a. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 directly made reservations for rooms at the Subject Motel 6 location and accepted payment for those rooms through a central reservation system that they controlled and operated. G6 could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 established and maintained control over a brand-wide "do not rent" system. G6 set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Motel 6 through detailed policies that it established regarding use of this "do not rent" system;

d. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 controlled room rates, required discounts, mandatory fees, and rewards program;

e. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which e G6 controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Motel 6;

h. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Motel 6 until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. Defendant operated the Subject Motel 6 pursuant to franchisor-mandated policies under which G6 required Franchisee to use G6's property management system, which was owned, maintained, controlled, and operated by G6, for virtually all aspects of hotel operations regarding room reservations and payment.

88. As a result of Defendant's use of these franchisor-mandated systems, traffickers operating at the Subject Motel 6 developed an ongoing business relationship with the hotels, including through repeated room rentals, brand loyalty, and reliance on G6 policies that created a favorable environment for trafficking.

89. Despite widespread and ongoing sex trafficking occurring at the Subject Motel 6, Defendant continued renting rooms to traffickers pursuant to franchisor-mandated systems and policies, including those governing reservations, payments, training, and reporting, without meaningful intervention.

90. Franchisee knew or should have known that Jane Doe (S.A.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (S.A.J.)'s sexual exploitation.

91. Upon information and belief, despite obvious and ongoing sex trafficking occurring at the Subject Motel 6, Defendant continued to operate their hotels pursuant to franchisor-mandated policies, systems, and practices that they knew or should have known facilitated sex trafficking. In particular, Defendant adopted, implemented, and relied upon policies and procedures governing staff training, safety and security, reservations, payment methods, internet access, reporting, and incident response that were inadequate to prevent trafficking and that permitted traffickers to operate with minimal risk of detection or disruption. These practices included, among other things, allowing rooms to be rented using cash or other non-traceable payment methods, providing internet access that was used to advertise and solicit commercial sex, failing to provide timely and effective training to staff on identifying and responding to trafficking, implicitly approving decisions not to report or meaningfully respond to suspected criminal activity, and continuing to use operational practices that had been shown to facilitate widespread trafficking at the Subject Motel 6.

92. Defendant knowingly benefited from providing rooms, services, and amenities to traffickers at the Subject Motel 6, including through the provision of internet and Wi-Fi services that were used to advertise, solicit, and arrange commercial sex. Defendant operated these services pursuant to franchisor-mandated information technology systems and policies that allowed traffickers and sex buyers to repeatedly use the hotels for trafficking-related purposes, generating ongoing revenue and other benefits to Defendant.

93. Defendant operated the Subject Motel 6 using centralized, brand-mandated systems governing internet access, information technology, and the collection and storage of guest data, including data related to reservations, payment methods, length of stay, and internet usage.

Defendant had access to and control over this information and, through reasonable diligence, could have identified patterns consistent with ongoing sex trafficking occurring at the Subject Motel 6.

94. Despite these readily available indicators, Defendant continued to provide internet access and related services that they knew or should have known were being used to facilitate sex trafficking, including by allowing access to websites commonly used to advertise commercial sex. By continuing to provide these services without meaningful intervention, Defendant enabled traffickers to advertise, solicit, and exploit victims, including Jane Doe (S.A.J.), while retaining the financial benefits associated with repeat bookings and guest activity.

95. Had Defendant exercised reasonable care and diligence in operating their respective Properties and in implementing and enforcing the policies, procedures, and systems under which they operated, they would have prevented the hotels from being used to facilitate widespread and ongoing sex trafficking. Instead, Defendant's continued reliance on inadequate practices and their failure to intervene affirmatively facilitated the trafficking of Jane Doe (S.A.J.) at the Subject Motel 6.

96. Defendant operated the Subject Motel 6 under franchisor-mandated policies governing staff training, security, reporting, internet access, guest data collection, and incident response. The obvious signs of trafficking exhibited by Jane Doe (S.A.J.) would have been detected had Defendant exercised reasonable diligence in implementing and enforcing these policies. Instead, Defendant's reliance on and adherence to these systems allowed trafficking to occur openly and repeatedly over an extended period.

97. Jane Doe (S.A.J.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if Franchisee had used reasonable diligence in the aspects of hotel operations over which they retained control.

98. Moreover, Jane Doe (S.A.J.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Motel 6 over an extended period because Franchisee adopted policies and practices that insulated Jane Doe (S.A.J.)'s trafficker from significant risk of detection or disruption.

**V. Defendant's ventures at the Motel 6.**

99. Through the conduct described above, Franchisee knowingly benefited from engaging in a venture with sex traffickers at the Subject Motel 6 named herein, including Jane Doe (S.A.J.)'s trafficker, as follows:

a. Franchisee received benefits, including increased revenue, every time a room was rented at their respective property;

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Subject Motel 6, which Franchisee knew or should have known about;

c. Franchisee associated with traffickers, including Jane Doe (S.A.J.)'s trafficker, by continuing to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d. Franchisee had a mutually beneficial relationship with the traffickers at the Subject Motel 6, fueled by sexual exploitation of victims, including Jane Doe (S.A.J.);

e. Sex traffickers, including Jane Doe (S.A.J.)'s trafficker, frequently used the Subject Motel 6 for their trafficking because of an implicit understanding that the Subject Motel 6 was an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Franchisee facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for Franchisee;

f. Franchisee participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g. Jane Doe (S.A.J.)'s trafficking at the Subject Motel 6 was a result of Franchisee's participation in a venture with criminal traffickers. If Franchisee had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (S.A.J.)'s trafficking at the Subject Motel 6.

100. Through the conduct described above, Defendant knowingly benefited from participating in a commercial venture involving the operation of the Subject Motel 6 pursuant to franchisor relationships and brand-mandated systems. Defendant associated with G6, as franchisor, to operate the Subject Motel 6 under franchise agreements through which both Defendant and G6 received financial benefits, including revenue generated by renting rooms to traffickers. Defendant shared in these benefits and had a common incentive to maximize occupancy and revenue while minimizing operating costs, including by failing to disrupt or meaningfully respond to widespread sex trafficking occurring at the hotels. By continuing to operate the Subject Motel 6 in this manner, Defendant benefited from repeat bookings, brand loyalty, and reduced enforcement costs, while Jane Doe (S.A.J.)'s trafficking occurred openly and repeatedly at the hotels. Jane Doe (S.A.J.)'s exploitation at the Subject Motel 6 was a direct and foreseeable result of Defendant's participation in and benefit from this venture.

## VI. Franchisee (as agents) Operated the Subject Motel 6 Pursuant to Franchisor-Mandated Policies and Systems.

101. The Subject Motel 6 were operated by Defendant pursuant to detailed franchisor-mandated policies, standards, and protocols established by G6. These policies, manuals, and directives governed virtually all aspects of hotel operations, including staffing, training, check-in and payment procedures, housekeeping, safety and security, guest relations, marketing, recordkeeping, internet access, and operational audits. Defendant implemented, relied upon, and were bound by these franchisor-mandated systems in their day-to-day operations at the Subject Motel 6.

102. Upon information and belief, G6 structured these policies and systems through franchise agreements, written manuals, and formal and informal protocols, which were treated as confidential and proprietary. These standards:

a. Did not merely identify quality or outcome standards but specifically controlled the means, methods, and tools Defendant used to operate the Subject Motel 6;

b. Covered virtually all aspects of hotel operations, including internal functions;

c. Dictated the manner in which Defendant and hotel staff carried out day-to-day functions; and

d. Significantly exceeded what was necessary to protect G6's registered trademarks.

103. Upon information and belief, G6 exercised and reserved the right to exercise pervasive control over Defendant's day-to-day operations of the Subject Motel 6, including but not limited to:

a. Requiring Defendant and hotel management to participate in mandatory training programs, both during onboarding and on an ongoing basis, covering all aspects of hotel operations;

b. Providing training on-site at the Subject Motel 6 or at locations selected by G6;

c. Requiring all hotel staff to participate in training provided via an online learning platform controlled by G6

d. Controlling the content, methods, and delivery of training provided by Defendant to hotel staff

e. Retaining discretion to determine whether training had been satisfactorily completed

f. Designating approved vendors for certain products and services required to operate the hotels and prohibiting Defendant from using unapproved vendors

g. Requiring Defendant to use specific hardware, software, and peripheral equipment under a technology agreement

h. Setting staffing levels

i. Establishing detailed job descriptions and policies dictating which positions performed which tasks

j. Controlling the hiring process and overseeing employee discipline and termination

k. Providing benefits to hotel employees

l. Requiring use of a customer resource management program maintained by G6

m. Controlling guest complaint channels and supervising responses, including refunds and compensation

n. Generating reports and analysis of guest complaints and online reviews

o. Requiring use of a Guest Relations Application owned and operated by G6 to manage guest data

p. Setting insurance requirements and retaining the right to purchase insurance on behalf of Defendant if necessary

q. Auditing the books and records of Defendant

r. Conducting frequent and unscheduled inspections of the properties

s. Retaining the right to issue fines, require corrective actions, and enforce policies, including termination of franchise agreements

t. Controlling all marketing for the properties and prohibiting unapproved online presence

u. Imposing detailed recordkeeping and reporting requirements;

v. Supervising day-to-day operations through detailed reporting and property management systems; and

w. Retaining the right to revise policies or adopt new requirements governing day-to-day hotel operations.

104. Defendant carried out all day-to-day operations of the Subject Motel 6 under these franchisor-mandated policies and systems, and these policies directly influenced how rooms were rented, how staff interacted with guests, how trafficking-related indicators were monitored, and how hotel operations were managed on a daily basis.

## VII. Defendant is Jointly and Severally Liable for Jane Doe (S.A.J.)'s Damages.

105. The venture or ventures in which Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (S.A.J.).

106. Under the TVPRA, Defendant is jointly and severally liable for all damages that a jury awards to Jane Doe (S.A.J.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

107. Jane Doe (S.A.J.) incorporates all previous allegations.

**I. Count 1: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendant).**

108. Jane Doe (S.A.J.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

109. Through acts and omissions described throughout this Complaint, Franchisee received a financial benefit from participating in a venture with traffickers, including Jane Doe (S.A.J.)'s trafficker, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (S.A.J.)'s trafficker, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisee is liable as a beneficiary under 18 U.S.C §1595(a).

110. The acts and omissions described throughout this Complaint, including Defendant's operation of the Subject Motel 6 pursuant to franchisor-mandated policies and systems, directly contributed to the ongoing trafficking of Jane Doe (S.A.J.) and allowed Defendant to benefit financially from such operations.

111. Defendant's violations of 18 U.S.C §1595(a), through their participation as beneficiaries, operated, jointly with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.A.J.) to suffer substantial physical and psychological injuries and other damages as a result of being trafficked and sexually exploited at the Subject Motel 6.

## DISCOVERY RULE

112. To the extent Defendant assert an affirmative defense of limitations, Jane Doe (S.A.J.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (S.A.J.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (S.A.J.) filed this lawsuit.

113. While under the control of her traffickers through at least December 2015, Jane Doe (S.A.J.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (S.A.J.)'s trafficker used threats of physical violence and restraint to violence to prevent Jane Doe (S.A.J.) from leaving or escaping. Jane Doe (S.A.J.) could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

114. While under the control of her traffickers, Jane Doe (S.A.J.) was subjected to extraordinary manipulation and coercion that produced lasting effects on her mental capacity that persisted throughout and well beyond the time she was actively trafficked. Jane Doe (S.A.J.)'s trafficker groomed her to become dependent on him, instilling in her that if she left, she would have nothing, so she was better off staying with them. Jane Doe (S.A.J.)'s trafficker provided everything for her so that she would always remain dependent on them. Any time she refused to perform sex acts or wanted to leave, Jane Doe (S.A.J.) was met with threats of violence and actual physical harm. As a result of these effects, she could not—through the exercise of ordinary diligence—discover and pursue her legal rights.

115. This continuous trafficking resulted from Defendant's continuous facilitating of trafficking at the Subject Motel 6 and Defendant's ongoing venture with criminal traffickers.

## DAMAGES

116. Franchisee's acts and omissions, individually and collectively, caused Jane Doe (S.A.J.) to sustain legal damages.

117. Franchisee is joint and severally liable for all past and future damages sustained by Jane Doe (S.A.J.).

118. Jane Doe (S.A.J.) is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future);

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Exemplary/Punitive damages;

j. Attorneys' fees;

k. Costs of this action; and

l. Pre-judgment and all other interest recoverable.

## JURY TRIAL

119. Jane Doe (S.A.J.) demands a jury trial on all issues.

## RELIEF SOUGHT

120. WHEREFORE, Jane Doe (S.A.J.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (S.A.J.) against Defendant jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (S.A.J.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

/s/ *Luis O. Sanchez*

Sico Hoelscher Harris, LLP
David E. Harris | SBN 24049273
Luis O. Sanchez | SBN 24130926
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
lsanchez@shhlaw.com

and

Annie McAdams PC
Annie McAdams | SBN 24051014
2900 North Loop West
Suite 1130
Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
annie@mcadamspc.com

ATTORNEYS FOR PLAINTIFF